1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7
8
9
10
11

RODNEY BERNARD BARNO,

    Plaintiff,

    v.

ARMANDO PADILLA, et al.,

    Defendants.

Case No. 20-cv-03886-SI (pr)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 33

12
13
14
15
16
17
18

Plaintiff Rodney Bernard Barno is presently incarcerated in the Correction Training Facility ("CTF") in Soledad, California.  Dkt. No. 1 (Compl.).  Appearing *pro se* on June 12, 2020, Barno filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983, alleging retaliation by the following defendants employed as correctional officers from 2018 to 2019 when the alleged events took place: Armando Padilla; Derrek Campagna; A. Kuster; Alvin Saint-Louis; and Gaylen Woods. *Id*.  Barno seeks injunctive and declaratory relief as well as punitive damages.  *Id*. at 17-18.

19
20
21
22
23

Before the Court is defendants' Motion for Summary Judgment filed against Barno.  Dkt. No. 49.  Defendants move for summary judgment on the merits of Barno's claims and on their defense of qualified immunity, as well as on the ground that Barno did not exhaust administrative remedies for some of his claims.  Barno opposes the motion.  Based on careful review of the affidavits, exhibits, and moving papers, summary judgment will be **GRANTED**.

24
25

**BACKGROUND**

26
27

The complaint focuses mainly on an incident on February 8, 2019 at an officer's podium, but Barno also asserts claims based other acts of retaliation by defendants.  *See* Dkt. No. 1 at 6-16.

28

United States District Court
Northern District of California

A.      Factual Background

The following facts are undisputed unless otherwise noted.

1.      The Podium Incident

In 2019, Barno was housed in CTF's Facility A, Fremont Dorm, a bunk-bed dormitory setting with an "officers' podium" located in the dayroom of the dorm.  Dkt. No. 33-8 ¶ 4 (Woods Decl.).  The podium was often staffed with correctional officers.  *Id.*  Unless directed otherwise, inmates could approach the podium to inquire into programs or request copies of Form 602s (i.e., inmate grievance forms).  *Id.*  On February 8, 2019, Campagna ordered Barno to the officers' podium and informed him that he would be assigned a bunkmate.  Dkt. No. 33-3 ¶ 14 (Campagna Decl.).  Barno asserts that Campagna has a long history—dating back as far as February 2018—of housing him with "numerous incompatible and/or troubled inmates…who were gang members, mentally ill, always in fights and tattooing."  Dkt. No. 44 ¶ 48 (Barno Decl.).  Campagna asserts the new bunkmate assignment was due to "institutional needs and housing availability."  Dkt. No. 33-3 ¶ 14 (Campagna Decl.).  Barno, however, asserts "it was never true" that he was actually "getting" a bunkmate, as there were 70 other beds available.  Dkt. No. 44 ¶ 49 (Barno Decl.).  Rather, Barno believes Campagna was merely trying to harass and antagonize him with news of a new assignment. *Id.*

Both Campagna and Woods stood behind the podium when Barno approached around 11:10 am on February 8, 2019.  Dkt. No. 33-8 ¶ 4 (Woods Decl.).  Upon being informed of the bunkmate assignment, Barno grew visibly agitated, started pacing near the officer's podium, and began raising his voice at both Campagna and Woods.  Dkt. Nos. 33-8 ¶ 4 (Woods Decl.); 33-3 ¶ 14 (Campagna Decl.).  At some point, Barno told Campagna he would report him for "harassment and retaliation" for Campagna's ongoing housing assignments.  Dkt. No. 1 ¶ 18.  Barno asked Woods for copies of Form 602s to submit such a grievance against Campagna; Woods complied and provided Barno with the forms.  Dkt. Nos. 33-8 ¶ 6 (Woods Decl.); 44 ¶ 20 (Barno Decl.).  But Barno alleges that Woods "threatened him" with "false disciplinary charges" after Barno requested the forms, and Campagna told Barno that Padilla, a senior hearing officer, would preside over the disciplinary

2

United States District Court
Northern District of California

1    proceeding and impose the maximum punishment.  Dkt. No. 1 ¶ 18.

2        As Barno continued to pace and raise his voice, Saint-Louis, who supervised both Campagna

3    and Woods, approached the podium and "attempted to deescalate the situation by speaking" with

4    Barno.  Dkt. No. 33-3 ¶ 14 (Campagna Decl.).  Campagna asserts he then "gave" Barno "at least

5    two direct orders to leave the officers' podium area, informing him that we were done having a

6    discussion about him having a bunkmate."  Dkt. No. 33-3 ¶ 14 (Campagna Decl.).  But Barno asserts

7    he was never actually ordered to leave the podium area: "all [Campagna] said was 'we're done'

8    talking, which I interpreted to mean about the topic discussed.... I was never told to leave the podium

9    by D. Campagna.  He only expected I interpreted 'we're done' talking about a bunk mate as an order

10   to leave."  Dkt. No. 44 ¶ 19 (Barno Decl.).  Thus, Barno did not leave.

11       Woods then placed a wooden "podium recall" sign on top of the officers' podium, visible to

12   Barno.  Dkt. No. 33-8 ¶¶ 4-5 (Woods Decl.).  This sign signals "to inmates that they were not

13   permitted to approach the officers' podium at that time."  *Id*.  Barno himself testified that he

14   understood the sign "as a form of telling inmates to get away from [the] podium."  Dkt. No. 49-2 at

15   3 (Barno Depo.).

16       While Woods described himself as merely placing the sign down, Barno states that Woods

17   "slammed" the sign down, "almost hitting [his] face and fingers" in the process.  Dkt. No. 44 ¶ 22

18   (Barno Decl.).  "Out of fear and reaction," Barno declares, he then "swiped [the sign] away and it

19   fell on the floor."  *Id*.; s*ee also* Dkt. Nos. 44-6 at 22, Ex. T ¶ 2 (Khafati Decl.) (inmate who witnessed

20   the incident declaring "Barno pushed [the sign] away and it fell to the ground.  Barno didn't grab

21   and throw it to or across the floor."); 44-6 at 28, Ex. U ¶ 10 (Bingaman Decl.) (same). Woods,

22   Campagna, and Saint-Louis, in contrast, declare that Barno grabbed the sign and threw it onto the

23   floor.  Dkt. Nos. 33-8 ¶ 5 (Woods Decl.); 33-3 ¶ 14 (Campagna Decl.) ("grabbed and threw to the

24   floor in an aggressive manner"); 33-7 ¶ 3 (Saint-Louis Decl.).

25       Barno then began walking away from the officers' podium towards his bunk.  Dkt. Nos. 33-

26   8 ¶ 5 (Woods Decl.); 33-7 ¶ 4 (Saint-Louis Decl.).  Campagna recalls Barno walking away with his

27   "fists clenched"—a fact that Barno contests.  Dkt. Nos. 33-3 ¶ 14 (Campagna Decl.); 44 ¶ 20 (Barno

28   Decl.) ("I also did not ever clench my fist at officers on 2/8/19.  I had grievance forms in my hands

and couldn't clench my fists anyway."). While Barno was walking away, Saint-Louis gave him an order to stop and "cuff up," to which Barno complied. Dkt. Nos. 33-3 ¶ 14 (Campagna Decl.). Saint-Louis states he felt compelled to issue this order when "it appeared that [Barno's] behavior was beginning to agitate the other inmates" nearby. Dkt. No. 33-7 ¶ 4 (Saint-Louis Decl.). However, Barno points out that no alarm or code was activated, which he suggests is customary "when inmates are disruptive." Dkt. No. 44 ¶ 25 (Barno Decl.).

Saint-Louis then placed Barno in handcuffs and escorted him through an outdoor patio and into an indoor holding cell. Dkt. No. 33-7 ¶ 4 (Saint-Louis Decl.). As Barno described it in his complaint,

> Saint-Louis placed cuffs on plaintiff so tight it caused pain and injury. Saint-Louis put plaintiff outside in cold temperatures with no shoes, socks, jacket, or pants to freeze. [Barno's] toes, fingers, and face became numb where he shook and shiver, leading to back and hip pain to an existing medical condition.

Dkt. No. 1 ¶ 19. Barno alleged that when he complained of the pain caused by the handcuffs and the cold temperatures, Saint-Louis responded with "threats of using excessive force with his spray and baton" and said he "should slam [Barno] to the ground." *Id.* Saint-Louis, however, denies making any threats and declares that he promptly removed the handcuffs and requested a medical evaluation after placing Barno into the holding cell. Dkt. No. 33-7 ¶¶ 4-5 (Saint-Louis Decl.). A Medical Report timestamped 11:32 am indicates that Barno was evaluated by medical staff, who noted reddened areas along both wrists but no other injuries. Dkt. No. 33-7 at 12, Ex. B. Barno admits "the only injuries sustained from Saint-Louis were wrist injuries." Dkt. No. 33-2, Ex. A at 9 (Barno Depo.). Barno also testified that he did not seek additional medical treatment for those wrist injuries. *Id.*

2.    Disciplinary Actions are Taken

Campagna prepared a Rule Violation Report ("RVR") following the incident at the podium for "the specific act of disobeying a direct order." Dkt. Nos. 33-3 ¶ 16 (Campagna Decl.); 44-5 at 4, Ex. O (Campagna's written response to Barno's request to investigate the disciplinary action) ("You inmate Barno are receiving a RVR for disobeying several direct orders to leave the podium

United States District Court
Northern District of California

as we were done talking about you having a bunk mate.").  Campagna submitted the RVR against Barno on February 10, 2019 along with a supplemental report authored by Woods.  Dkt. No. 33 at 59-62, Ex. E.

Saint-Louis, as Campagna's supervisor, declared that "[a]fter the RVR was prepared, but before it was issued to [Barno]," he "communicated with [Campagna] about the incident on February 8, 2019 to ensure that the RVR included an accurate and complete report of what occurred."  Dkt. Nos. 33-3 ¶ 7 (Campagna Decl.).[1]

One month later, on March 8, 2019, Padilla, a "correctional lieutenant, [who] serve[s] as a senior hearing officer presiding over disciplinary hearings," presided over Barno's disciplinary hearing related to the RVR.  Dkt. No. 33-6 ¶¶ 1, 7 (Padilla Decl.).  Padilla found Barno guilty of the offense "based on the RVR, which documented [Barno's] refusal to leave the officers' podium and that [Barno] threw a sign across the floor in an aggressive manner."  *Id.* ¶ 7.  As a result, Barno lost 20 days of credit (mitigated down from 30-days) and was subject to a 90 day restriction on his family visits, canteen draw, telephone calls, yard access, recreational and entertainment activities, and package privileges.  *Id.* ¶ 8.  Barno "could have, but was not, assessed any time restricted to quarters—i.e., not allowed out of his cell or area of assignment."  *Id.*

### 3.    CTF's Bed Move Policy and Barno's Bed Moves

Inmates are expected to accept housing assignments directed by staff, and inmates are not entitled to a single-cell assignment, housing location of choice, or to a cellmate of their choice.  Dkt. Nos. 33-3 ¶ 6 (Campagna Decl.).  At CTF, inmates are routinely moved and assigned new housing placements in order to meet the needs of the institution.  *Id.* ¶ 7.  In addition to inmate movement for safety and medical reasons, inmates may be moved after losing programming or other privileges due to a disciplinary action.  *Id.*  Inmate housing assignments may also change based on medical

---

[1] Barno states the version of the RVR completed on February 10, 2019 was "completely different" from the version that Campagna initially prepared right after the incident on February 8, 2019: "it did not initially include that I clenched my firsts, was agitated, paced the floor or slammed a sign to the floor.  These were later added."  Dkt. No. 44 ¶ 8 (Barno Decl.).  Campagna concedes that "RVR reports are often revised and edited."  Dkt. No. 33-3 ¶ 13 (Campagna Decl.).

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

reasons, accommodations, and program assignments.  *Id.*  At CTF, correctional officers working in housing units initiate bed move requests.  *Id.*  Bed move requests are then approved or denied by a correctional sergeant depending on whether the inmate meets the proper criteria for the change in housing assignment.  *Id.*

On March 13, 2019, following the disposition of Barno's RVR resulting in a loss of privileges, Saint-Louis processed a bed move for Barno from Fremont Dorm to Lassen Hall that was requested by Officer M. Jackson (a non-party) and reviewed by Kuster. Dkt. No. 33-7 ¶ 8, Ex. D (Saint-Louis Decl.); *Id.* Ex. D (Bed Request Batch).  When processing bed moves, Saint-Louis always ensured that inmates, including Barno, met the proper criteria for the housing assignment change.  *Id.*  Meanwhile, Barno claims Kuster

> went out of his way to subject [Barno] to punitive living conditions in retaliation for filing appeals by changing [Barno's] housing to a less desirable area where he was housed with inmates with serious behavioral problems and exposed to cruel and unusual conditions of confinement:
>
> 1.   Extremely cold temperatures.
>
> 2.   Rust on the desk, bed, locker that amounts to a health and safety issue.
>
> 3.   Unsanitary mattress w[ith] stains and odors.
>
> 4.   No shower access.
>
> 5.   Cell missing 5 windows subjecting [him] to cold temperatures.
>
> 6.   No light switch which led hand burning on bulb to turn on and off.
>
> 7.   Glass everywhere that got into [his] fingers and feet after electrical short that caused bulb to explode in [his] face while turning light on.
>
> 8.   Slipped and fell when trying to access locker that's 7 feet high.
>
> 9.   Smell of urine and feces due to toilet timer.
>
> 10.  Being in [] smaller living quarter[s] causing [him] to hit his head, elbows, back and legs on metal as he moved around.

Dkt. No. 1 ¶ 22.  Barno grieved this claim through the California Department of Corrections and Rehabilitation's ("CDCR's") administrative grievance process by filing Grievance Log No. CTF-19-01081.  The evidence indicates that Barno notified the CDCR that he believed Kuster was retaliating against him by subjecting him to intolerable living conditions.  *See* Dkt. No. 33-4 at 98-

115, Ex. G.  The appeals board classified Barno's complaint as living conditions issue, not a staff issue.  *Id.*  The Office of Appeals in Sacramento, the third and final level of review for inmate grievances, denied the appeal on August 22, 2019.  *See* Dkt. No. 44-5 at 44, Ex. Q.  The Office of Appeals, in denying Barno's claim, confronted a dearth of evidence relating to the alleged unsanitary living conditions, stating as follows:

> appellant has failed to present any evidence that the [CTF] is subjecting him to unsanitary living conditions…  Although the appellant asserts that his cell was unsanitary and had mechanical issues, he has failed to present any specific evidence, other than his own statements, that he is being exposed to an unsanitary environment.

*Id.*

On June 8, 2019, Barno received a "convenience" bed move from Lassen Hall to Fremont Dorm bunk 96.  Dkt. Nos. 33-3 ¶ 9 (Campagna Decl.), Ex. C-D (Grievance No. CTF-S-19-02580 and Custody Records).  After receiving the bed move on June 8, 2019, Barno filed Grievance Log No. CTF-S-19-02580, alleging that Campagna and Officer Jackson retaliated against him by denying Barno's bed move request in July 2019, one month *after* Barno was given the bed move from Lassen Hall to Fremont Dorm.  *Id.*

Barno asserts Campagna retaliated against him on July 21, 2019 by "forcing him to be housed with an incompatible inmate, as threatened in the past," even though "there were over 70 other beds open and Campagna decided to choose Barno's bunk to move an inmate who had a history of causing conflicts with other bunk mates."  Dkt. No. 1 ¶ 24.  There is nothing in Barno's custody records or central file that shows he was ever housed with an "incompatible" cell or bunk mate.  Dkt. Nos. 33-3 ¶ 10 (Campagna Decl.).

### 4.  Previous Retaliatory Acts by Campagna

Barno's complaint also alleges a previous retaliatory act by Campagna on October 8, 2018, during which Campagna and Officer Jackson conducted a random search of Barno's living quarters in Fremont Dorm.  Dkt. No. 1 ¶ 23.  Meanwhile, Campagna declares that searches "are intended to be random, unannounced, and sporadic, so that they cannot be anticipated and thwarted."  Dkt. Nos. 33-3 ¶ 3 (Campagna Decl.).  Campagna declares that on October 8, 2018, he and Officer Jackson

7

conducted "a random search" of Barno's living quarters which was "not based on retaliation, nor was it conducted because of [Barno's] filing of inmate grievances or litigation history." *Id.* ¶ 5.

The number one obligation of every CDCR employee working in one of California's prisons is maintaining the safety and security of inmates, staff, and the institution itself. *Id.* ¶ 3. Searches are a key component of maintaining that safety and security. *Id.* Searches are intended to be random, unannounced and sporadic, so that they cannot be anticipated and thwarted. *Id.* Searches locate contraband so that it can be confiscated, and every employee is obligated to identify and confiscate contraband as a matter of institutional safety and security. *Id.* As a correctional officer working at CTF, Campagna was permitted and expected to perform three such searches each day for contraband or other items that could pose a threat to the safety and security of the institution. *Id.* ¶ 4. Routine searches are directed at thwarting possession of contraband or theft, and thereby further a legitimate correctional goal. *Id.* Barno admitted during his deposition that officers are allowed to "conduct random searches" of inmates' living quarters at CTF, but claims that the October 8, 2018 search was "not a random search" because "[he] was targeted and the only one targeted." Dkt. No. 33-2, Ex. A at 21-22 (Barno Depo.).

B.     Barno's Present Lawsuit

All the alleged retaliatory acts stemming from the podium incident described above, along with other alleged retaliatory acts by defendants, compelled Barno to file this lawsuit pursuant to 42 U.S.C. § 1983 alleging First Amendment and due process violations. On November 6, 2020, the Court reviewed Barno's complaint pursuant to 28 U.S.C. § 1915A and concluded that it stated a claim against Padilla, Campagna, Saint-Louis, Woods, and Kuster for retaliation, and against Lara for violating Barno's First Amendment right to send mail. Dkt. No. 9 at 8. All other defendants and claims were dismissed, including the due process claim. *Id*. Lara was later dismissed in a joint stipulation. Dkt. No. 24.

**Claim 1**. For ease of reference and analysis, and although not described as such by Barno in his complaint and moving papers, the Court refers to the podium incident on February 8, 2019

United States District Court
Northern District of California

and its aftermath described above as **Claim 1**.[2]  The claim encompasses: Campagna's alleged efforts to antagonize Barno on February 8, 2019 by ordering Barno to the officers' podium to give him notice of a new bunkmate; Woods' threat that Barno would face "false disciplinary charges" for requesting a grievance form to report Campagna for "harassment and retaliation" for ongoing housing assignments; Campagna's threat that Padilla would preside over the resulting disciplinary hearing and impose the maximum penalty; Woods "slamm[ing]" a wooden sign inches from Barno's face (almost hitting his fingers) and Barno removing it; Saint-Louis detaining Barno and subjecting him to wrist injuries and cold weather and when he complained of pain, Saint-Louis responded with threats of force; Campagna revising the RVR between February 8 and February 10, 2019 resulting in false disciplinary charges served on Barno on February 12, 2019; and Padilla's adjudication of the RVR and imposition of the maximum punishment on March 8, 2019.  Barno submitted these facts in a grievance through the CDCR's administrative grievance process under Grievance Log No. CTF-19-00566.  *See* Cal. Code Regs. tit. 15 §§ 3084-3084.9 (2019).  The Office of Appeals denied the appeal on August 8, 2019.  Dkt. No. 33-4, Ex. D.

**Claim 2.**  Barno alleges that Campagna initiated a previous retaliatory act on October 8, 2018 by subjecting Barno to a "retaliatory search" in response to Barno's verbal comments about another correctional officer, i.e., "telling another inmate that a specific [sergeant] resembled another officer."  Dkt. No. 1 ¶ 23.  Barno alleges that his property was left scattered and unsecure after the search.  *Id.*  Barno exhausted his remedies for this search through CDCR's administrative grievance process.  The Office of Appeals denied Barno's appeal on May 31, 2019.  Dkt. No. 33-5, Ex. 3.

**Claim 3**.  Barno claims that Padilla, Campagna, and Saint-Louis "threatened" him "if he continued litigation against them, specifically this complaint," and he only felt safe filing this lawsuit after he was relocated to a different facility in April 2020 "where the biggest threat, Defendant Padilla, is not in control."  Dkt. No. 1 ¶ 17.  There is no evidence that Barno pursued recourse for this claim through CDCR's administrative grievance process.

**Claim 4**.  Barno claims that on February 11, 2019, Campagna tried to dissuade him from

---

[2] The Court notes that defendants have numbered the claims differently in their motion for summary judgment, but all the same claims are included in this order.  *See* Dkt. No. 33 at 9-10.

United States District Court
Northern District of California

1   assisting another inmate who had been falsely accused of a rule violation file a grievance.  Dkt. No.

2   1 ¶ 20.   Barno grieved this claim through CDCR's administrative grievance process by filing

3   Grievance Log No. CTF-19-00586.  The Office of Appeals denied the appeal on June 21, 2019.

4   Dkt. No. 33-4, Ex. E.  Barno asserts that Campagna's attempts at dissuasion included changing the

5   facts in the RVR pertaining to the podium incident and a statement that if Barno continued his efforts

6   to file appeals against Campagna, it "wouldn't be good" for Barno.  Dkt. No. 1 ¶ 20.

7        **Claim 5.**   Barno claims that March 13, 2019, Kuster retaliated against Barno for filing

8   administrative appeals by subjecting him to "punitive living conditions," such as living in "a less

9   desirable area where he was housed with inmates with serious behavioral problems and exposed to

10  cruel and unusual conditions of confinement."  Dkt. No. 1 ¶ 22.  Barno grieved this claim through

11  CDCR's administrative grievance process by filing Grievance Log No. CTF-19-01081.  The Office

12  of Appeals denied the appeal on August 22, 2019.  Dkt. No. 33-4, Ex. G.

13       **Claim 6.**  Barno claims that on July 21, 2019, Campagna retaliated against Barno by forcing

14  him to house with an incompatible inmate, "as threatened in the past."  Dkt. No. 1 ¶ 24.  Barno

15  grieved this claim through CDCR's administrative grievance process by filing Grievance Log No.

16  CTF-19-02580.  Dkt. No. 33-4, Ex. I.

17       Defendants filed the present motion for summary judgment on November 3, 2021.  Dkt. No.

18  33.  The matter has been fully briefed and the Court is prepared to decide the motion.

19

20                                    **LEGAL STANDARD**

21       Summary judgment is proper where the pleadings, discovery and affidavits show that there

22  is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

23  law."  Fed. R. Civ. P. 56(a).  The court will grant summary judgment "against a party who fails to

24  make a showing sufficient to establish the existence of an element essential to that party's case, and

25  on which that party will bear the burden of proof at trial . . . since a complete failure of proof

26  concerning an essential element of the nonmoving party's case necessarily renders all other facts

27  immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty*

28  *Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit

United States District Court
Northern District of California

10

1    under governing law, and a dispute about a material fact is genuine "if the evidence is such that a

2    reasonable jury could return a verdict for the nonmoving party").

3          Generally, as is the situation with defendants' challenge to the retaliation claims, the moving

4    party bears the initial burden of identifying those portions of the record which demonstrate the

5    absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go

6    beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories,

7    and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

8    *Celotex*, 477 U.S. at 324.

9          When a defendant moves for summary judgment on an affirmative defense on which he

10   bears the burden of proof at trial, he must come forward with evidence that would entitle him to a

11   directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965 F.2d 1532,

12   1536 (9th Cir. 1992).  The failure to exhaust administrative remedies is an affirmative defense that

13   must be raised in a motion for summary judgment.  *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th

14   Cir. 2014) (en banc).  On a motion for summary judgment for nonexhaustion, the defendant has the

15   initial burden to prove "that there was an available administrative remedy, and that the prisoner did

16   not exhaust that available remedy."  *Id.* at 1172.  If the defendant carries that burden, the "burden

17   shifts to the prisoner to come forward with evidence showing that there is something in his particular

18   case that made the existing and generally available administrative remedies effectively unavailable

19   to him."  *Id.*  The ultimate burden of proof remains with the defendant, however.  *Id.*  If material

20   facts are disputed, summary judgment should be denied, and the "district judge rather than a jury

21   should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge

22   rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-

23   71.

24         The court's function on a summary judgment motion is not to make credibility

25   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

26   *Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

27   must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn

28   from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

United States District Court
Northern District of California

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Here, Barno's complaint is verified (*see* Dkt. No. 1 at 19) as well as his opposition (*see* Dkt. No. 42 at 5) and declaration (*see* Dkt. No. 44 at 35), and they are therefore considered as part of the evidence in opposition to defendants' Motion For Summary Judgment.

## DISCUSSION

A.   Barno Failed To Exhaust Administrative Remedies For Claim 3

    1.   Exhaustion Requirements

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Exhaustion in prisoner cases covered by § 1997e(a) is mandatory.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement).  All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter,* 534 U.S. at 524.  Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.  *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001).  Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules."  *Id.* at 90.

An inmate "need not exhaust *unavailable* [remedies]."  *Ross*, 136 S. Ct. at 1858 (emphasis

added).  An administrative remedy is unavailable if, for example, "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; or if it is "so opaque that it becomes, practically speaking, incapable of use"; or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60.

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).  In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the California Department of Corrections and Rehabilitation or his designee.  *Id.* § 3084.1(b), § 3084.7(d)(3).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures.  *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations.").  California prisoners are required to lodge their administrative complaint on a CDCR 602 form.  The level of specificity required in the appeal is described in a regulation:

> The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue.  To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question. [¶] The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form, and if needed, the Inmate/Parolee Appeal Form Attachment.

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).[3]

---

[3] Several Ninth Circuit cases have referred to California prisoners' grievance procedures as not specifying the level of detail necessary and instead requiring only that the grievance "describe the problem and the action requested."  *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014)

2.     <u>Analysis</u>

Defendants have moved for summary judgment on the ground that Barno did not properly exhaust administrative remedies as to Claim 3,[4] stating as follows:

> [Barno's] inmate grievance history establishes that from October 8, 2018 (the date he alleges he first engaged in protected conduct against CTF staff) through June 12, 2020 (the date the complaint was filed), [Barno] submitted at least twelve grievances, seven of which he properly exhausted by obtaining a substantive decision at all three levels of review.  (Decl. Monroy, ¶¶ 6-16; Exs. A-J; Decl. Moseley, ¶¶ 6-15, Exs. A-I.)  However, none of [Barno's] grievances reference claim [3].[5]  (*Id.*)

Dkt. No. 33 at 20 (footnote added).  Claim 3 involved Barno's claim that Padilla, Campagna, and Saint-Louis "threatened" him "if he continued litigation against them, specifically this complaint," and Barno only felt safe filing this lawsuit after he was relocated to a different facility in April 2020 "where the biggest threat, Defendant Padilla, is not in control."  Dkt. No. 1 ¶ 17.  As mentioned above, no evidence exists showing that Barno pursued recourse for this claim through CDCR's administrative grievance process.

Defendants have carried their burden to demonstrate that Barno did not properly exhaust those available remedies as Claim 3.  The undisputed evidence shows that California provides an administrative remedies system for California prisoners to complain about their conditions of confinement, and that Barno used that California inmate appeal system to complain about some events that gave rise to his complaint.  The undisputed evidence also shows that the inmate appeals

---

(quoting Cal. Code Regs. tit. 15, § 3084.2); *Sapp*, 623 F.3d at 824 ("California regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code Regs. tit. 15, § 3084.2(a)"); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison or jail's procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'").  Those cases are distinguishable, however, because they did not address the regulation as it existed at the time of the events complained of in this action.  Since January 28, 2011, the operative regulation has required California prisoners using the CDCR's inmate appeal system to list the name(s) of the wrongdoer(s) in their administrative appeals.

[4] The Court notes that defendants have also argued that Barno's grievances relating to a few other claims (specifically, Claim 5 and portions of Claim 1) were "either properly rejected or grieved an issue other than retaliation."  Dkt. No. 33 at 20.  However, because the Court will resolve those claims on the merits below, it need not address defendants' alternative argument that they are unexhausted.

[5] As mentioned above, defendants have numbered the claims differently than the Court. Claim 3 was listed as "Claim 2" in defendants' Motion For Summary Judgment.  *Compare supra* BACKGROUND Part B. *with* Dkt. No. 33 at 9.  Thus, in order to keep the claim numbers consistent in this order, the Court will refer to this claim as "Claim 3."

filed pertaining to events alleged in the complaint did not assert a claim that Padilla, Campagna, and Saint-Louis "threatened" Barno if he continued litigation against them by filing the instant complaint. Defendants met their initial burden to prove "that there was an available administrative remedy, and that [Barno] did not exhaust that available remedy." *Albino*, 747 F.3d at 1172.

Once defendants met their initial burden, the burden shifted to Barno to come forward with evidence showing that something in his particular case made the existing administrative remedies "effectively unavailable to him." *Id.* Barno failed to make the requisite showing, and does not address this argument in his opposition. Even if Barno's statement that he did not exhaust his administrative remedies "due to fear" is construed to mean that he feared that further retaliation would come to him if he filed an appeal in order to exhaust Claim 3, such a statement does not show that administrative remedies were effectively unavailable. Instead, it would have shown that he chose not to use a process that he knew was available. Any contention that he did not file an appeal because he feared further retaliation is not credible because by April 17, 2020, Barno had been moved to another facility away from the alleged retaliation stemming from 2018-2019 had occurred. In lieu of filing an appeal relating to Claim 3, Barno chose to file the instant action (including unexhausted Claim 3) on May 18, 2020, the date he signed the complaint. Therefore, Barno has not met his burden to show that administrative remedies were effectively unavailable to him.

Barno failed to properly exhaust his administrative remedies as to Claim 3 *See Ngo*, 548 U.S. at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.") Bearing in mind that defendants have the ultimate burden of proof on the defense and viewing the evidence in the light most favorable to Barno, the Court concludes that defendants are entitled to judgment as a matter of law on the affirmative defense that Barno failed to exhaust administrative remedies as to Claim 3.

Due to the differences between the unexhausted Claim 3 and the exhausted claims against other defendants, Claim 3 can be dismissed while the exhausted claims against are separately adjudicated. That is, the entire action need not be dismissed based on the non-exhaustion of Claim 3. *See Jones v. Bock*, 549 U.S. 199, 222-24 (2007) (rejecting "total exhaustion-dismissal" rule);

*Lira v. Herrera*, 427 F.3d 1164, 1175 (9th Cir. 2005).  Claim 3 is therefore dismissed without prejudice to Barno filing a new action alleging that claim if he ever properly exhausts his administrative remedies for it.

B.    Retaliation Claims

As mentioned above, Barno claims that defendants retaliated against him during multiple instances from 2018-2019 because of his protected conduct, including for filing administrative grievances. *See* Dkt. 1 ¶¶ 15-24.  Defendants argue that the retaliation claims below fail because Barno: cannot establish that certain alleged activity amounted to protected conduct; cannot point out a causal connection between his First Amendment activity and their actions; and can neither show the absence of a legitimate penological purpose for their actions nor a chilling effect. *See* Dkt. 33 at 23-29.

A First Amendment retaliation claim brought by an inmate against prison officials "entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

"The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts," including making verbal or written complaints to prison officials. *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017).  When considering whether a state actor's adverse action had a chilling effect on the exercise of one's rights, the question is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities," *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999), not whether the specific plaintiff's activities were "actually inhibited or suppressed." *Rhodes*, 408 F.3d at 569.

As to the fifth element, the plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  "Institutional security is a legitimate correctional goal." *Nevada Dep't of*

*Corr. v. Greene*, 648 F.3d 1014, 1018 (9th Cir. 2011). To avoid "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone," *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 481 (1995)), the Ninth Circuit counsels in favor of affording "'appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory. *Id.* However, "[i]t is only after prison officials have put forth [evidence that the interest proffered is the reason why the regulation was adopted or enforced] that courts defer to the officials' judgment." *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990).

A prisoner must show a "causal connection between the adverse action and the protected conduct." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). "[M]ere speculation that defendants acted out of retaliation is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to prior lawsuit). "[T]iming can properly be considered as circumstantial evidence of retaliatory intent," although timing alone is not enough to support a finding of retaliation. *Pratt*, 65 F.3d at 808; *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this"); *see, e.g., Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003) (retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence); *Pratt*, 65 F.3d at 808 (error to find that the allegedly retaliatory action that preceded a television interview was caused by the interview).

1.    Claim 1 – Podium Incident and Aftermath

Based on the affidavits, exhibits, and moving papers, the Court concludes that, even viewing the facts and inferences in Barno's favor, defendants Campagna, Woods, Saint-Louis, and Padilla are entitled to summary judgment on the retaliation claim based on the podium incident and the resulting disciplinary action.

***Campagna's actions***. The podium incident began when Campagna informed Barno that he would have a bunkmate—an act which Barno characterizes as but one instantiation in a pattern of retaliatory housing decisions by Campagna between February 2018 and December 2019.  Dkt. No. 44 ¶ 48 (Barno Decl.).  In his declaration, Campagna states he does "not have the authority to unilaterally change an inmate's housing or bed assignments," Dkt. No. 33-3 ¶ 7 (Campagna Decl.)., whereas Barno declares that "Campagna did have full power to move inmates in specific housing locations, and did so." Dkt. No. 44 ¶ 48 (Barno Decl.).  The question whether Campagna had the authority to do as Barno alleged is thus disputed, and the Court is not authorized to resolve the conflicting declarations on summary judgment.  *See T.W. Elec. Serv. Inc.*, 809 F.2d at 630.

However, whether Campagna had unilateral authority over housing arrangements is immaterial to Barno's case if a change to Barno's housing, whether it materialized or not, was justified by a legitimate correctional goal or was not adverse enough to deter a person of ordinary firmness from exercising their right to air grievances.  Barno fails to present evidence sufficient to allow a reasonable jury to find the addition of a bunkmate in an open-floor dorm-style housing facility would not have been pursuant to CTF's interest in institutional security, as implemented through processes designed to "move[] and assign[] new housing placements in order to meet the needs of the institution."  Dkt. No. 33-3 ¶ 7 (Campagna Decl.).  Further, Barno also has failed to provide any evidence that having a bunkmate, or being threatened with the addition of a bunkmate in an open-floor dorm setting, would have deterred a person of ordinary firmness from exercising a protected right.  *See, e.g., Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir.1999) (holding that "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there," could deter a prisoner of ordinary firmness).

Barno's allegation that Campagna "changed" the facts in the RVR, although disputed by Campagna, also would not sustain a retaliation claim.  Even if Campagna revised the initial draft after consulting with Saint-Louis, *see* Dkt. No. 33-7 ¶ 7 (Saint-Louis Decl.), Barno has not alleged any facts suggesting that correctional officers revising a disciplinary report to ensure accuracy would deter a person of ordinary firmness from engaging in protected activities, especially when those

1    revisions do not depart substantially from the facts presented in the initial version of the report.

2         Finally, even if Campagna told Barno that Padilla would preside over a disciplinary hearing

3    and impose the maximum penalty for the "false" disciplinary report threatened by Woods (as

4    discussed below), Barno fails to present evidence sufficient to allow a reasonable jury to find that a

5    person of ordinary firmness would be deterred by the prospect of having an officer who is authorized

6    to preside over a disciplinary proceeding or impose the maximum punishment permitted by law

7    actually preside or impose such a punishment.

8         Accordingly, Campagna is entitled to summary judgment on the retaliation claims stemming

9    from the podium incident.

10

11        ***Saint-Louis' actions***.  Nor does Barno establish that the physical discomforts attributable to

12   Saint-Louis' handcuffing and placing him in a holding cell show an absence of a legitimate

13   penological purpose.  Even viewing the facts in the light most favorable to Barno—i.e., that he

14   "swiped" the wooden sign onto the ground out of fear reflex rather than aggression, that he did not

15   have clenched fists, that he subjectively failed to understand Campagna's "we're done" statement

16   as an order to leave the podium, and that no alarm or code was triggered to signal an inmate

17   disturbance—the Court cannot conclude that Saint-Louis actions were taken "because of" Barno's

18   protected activity as opposed to a legitimate correctional goal.  By Barno's own admission, he

19   understood the placement of the wooden "podium recall" sign as indicating that he needed to "get

20   away from [the] podium," yet he did not so do.  Dkt. No. 49-2, Ex. A at 3 (Barno Depo.).  Based on

21   the facts that Barno caused the wooden sign to fall to the ground, remained in the vicinity, and raised

22   his voice at the correctional officers in the presence of other inmates, a reasonable jury could have

23   found that such facts justified Saint-Louis' belief that other inmates nearby were growing agitated

24   and thus required securing Barno and escorting him out of the dorm.  The mere fact that Barno's

25   conduct was not severe enough to trigger an alarm or code does not mean that his removal was not

26   pursuant to a legitimate correctional goal—only that it was not severe enough to warrant a more

27   serious response.

28        Barno also does not establish that his removal and confinement would have deterred a person

of ordinary firmness from exercising their rights.  Although Barno complained of various bodily injuries and discomfort, he received prompt medical care in the holding cell and declined to pursue additional treatment for the wrist or weather-related injuries he alleged to have sustained.  Dkt. Nos. 33-7 at 12, Ex. B (medical report); 33-2, Ex. A at 9 (Barno Depo.).  Barno further alleges that Saint-Louis threatened Barno with physical force after he complained of wrist pain and cold temperatures.  Dkt. No. 1 at ¶ 19.  Saint-Louis denies making such threats.  Dkt. No. 33-7 ¶ 5 (Saint-Louis Decl.).  Again, the Court cannot resolve the veracity of these competing accounts on summary judgment.  *See T.W. Elec. Serv. Inc.*, 809 F.2d at 630.  Instead, the Court finds that Barno fails to establish that the threats, assuming they were made, were made "because of" Barno's continued exercise of his First Amendment right to pursue grievances.  Saint-Louis is also entitled to summary judgment on the retaliation claims stemming from the podium incident.

**_Woods' actions_**.  Viewing the evidence in the light most favorable to Barno, the record suggests that, when Woods placed the podium recall sign onto the podium, he nearly struck Barno's face and fingers.  While this fact is uncontested (although not admitted by defendants), the record does not support an inference that the sign was aggressively placed "because of" Barno's desire to file grievances, as opposed to Barno's refusal to leave the area after being told by Campagna that the conversation was over.  Woods is thus entitled to summary judgment on this claim.

Barno also complains that Woods provided him grievance forms only after threatening to file baseless disciplinary charges against him.  The record indicates that Woods complied with Barno's request for Form 602's at the podium.  Dkt. No. 44 ¶ 20 (Barno Decl.) ("I had grievance forms in my hands…").  And while "the mere threat of harm can be an adverse action," *see Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009), Woods states that he never threatened Barno with disciplinary charges for pursuing grievances.  Dkt. No. 33-8 ¶ 6 (Woods Decl.).  Because Barno fails to produce any evidence to the contrary in his own declaration or other submitted documents, Woods is entitled to summary judgment on this claim as well.

**_Padilla's actions_**.  Padilla, who is a senior hearing officer responsible for presiding over

United States District Court
Northern District of California

disciplinary hearings, had the authority to preside over Barno's March 8, 2019 hearing resulting from the podium incident.[6]  Dkt. No. 33-6 ¶¶ 1, 7 (Padilla Decl.).  Barno claims that he was found guilty by Padilla, and he received the "'maximum punishment,' in retaliation for filing appeals because the finding was not based on facts and evidence." Dkt. No. 1 ¶ 21.  Meanwhile, Padilla has provided a declaration in which he stated under penalty of perjury that on he found Barno guilty of the offense "based on the RVR, which documented [Barno's] refusal to leave the officers' podium and that [Barno] threw a sign across the floor in an aggressive manner." Dkt. No. 33-6 ¶ 7.  Padilla adds that "[a]t no point did [he] retaliate against [Barno], nor was any decision [he] made affected by [Barno's] filing of grievances, staff complaints, or any litigation." *Id.* ¶ 10. Aside from disagreeing with Padilla's version of what transpired at the March 8, 2019 hearing, Barno does not present any more evidence other than his conclusory statement that Padilla's aforementioned actions were in retaliation for filing appeals.  *See* Dkt. No. 1 ¶ 21.  However, sweeping conclusory allegations will not suffice. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").  Because Barno fails to offer any non-conclusory evidence that Padilla's adjudication of the RVR was retaliatory, Padilla is entitled to summary judgment.

### 2.    Claim 2 – October 8, 2018 Search

In Claim 2, Barno states that on October 8, 2018, Campagna "conducted a retaliatory search" of Barno's living quarters after overhearing Barno telling another inmate that a specific sergeant resembled another officer.  *See* Dkt. No. 1 ¶ 23.  Based on the affidavits, exhibits, and moving papers, the Court concludes that, even viewing the facts and inferences in Barno's favor, Campagna is entitled to summary judgment on the retaliation claim based on the October 8, 2018 search.

---

[6] The Court notes that Barno's original claim against Padilla involved a due process claim, *i.e.*, that Padilla was not an impartial arbiter, and that other inmates who committed more serious offenses received less serious punishment.  Dkt. No. 44 ¶¶ 27, 28 (Barno Decl.).  The Court previously dismissed Barno's due process claims because "the disciplinary punishment imposed did not amount to a deprivation of a protected liberty interest."  Dkt. No. 9 at 5.

The Court will first focus on whether Barno's verbal statement constituted protected conduct for the purposes of the October 8, 2018 search. Defendants point out that "[w]hile filing a grievance is protected conduct, neither the Ninth Circuit nor the Supreme Court has decided whether a prisoner's verbal complaints constitute protected conduct." Dkt. No. 33 at 24 (citing *Torres v. Arellano*, 2017 WL 1355823, at *13 (E.D. Cal. Mar. 24, 2017).) This Court agrees with defendants, and it has further confirmed that neither the Ninth Circuit nor the Supreme Court has recognized a mere comment on the *appearance of an officer* as protected conduct. Thus, Barno fails to establish that making a comment about a prison official qualifies as protected conduct.

Further, even if making such a verbal statement constituted protected conduct, Barno fails to establish that Campagna searched his bunk "because of" Barno's comments. The prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806. At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder*, 55 F.3d at 461-62 (defendants had qualified immunity against retaliation claim based on their decision to transfer prisoner to preserve internal order and discipline and maintain institutional security). Here, defendants urge that the retaliation claim fails because the cell search was supported by legitimate correctional goals. *See* Dkt. No. 33 at 24. Defendants state that "[i]nmates in the custody of CDCR can and should expect searches of their cell, room, or dormitory bed area at any time." *Id.* (citing Cal. Code Regs., tit. 15, § 3287). "Searches are a key component of maintaining . . . safety and security, and they are intended to be random, unannounced, and sporadic, so that they cannot be anticipated and thwarted." *Id.* (citing Dkt. No. 33-3 ¶ 3 (Campagna Decl.)). Campagna was "expected to perform three such searches each day for contraband or other items that could pose a threat to the safety and security of the institution." *Id.* (citing Dkt. No. 33-3 ¶ 4). Routine searches of inmates' dormitory bed areas serve a legitimate penological purpose of promoting institutional security by enabling prison officials to locate and confiscate contraband. *Id.* Moreover, Barno admits that correctional officers are permitted to conduct random bed searches at CTF. Dkt. No. 33-2, Ex. A at 21-22 (Barno Depo.). Campagna's declaration makes clear the correctional officers are authorized and expected to

perform frequent randomized searches of inmate's living quarters to ferret out contraband.  Dkt. No. 33-3 ¶ 3 (Campagna Decl.).  "[R]outine shakedowns of prison cells are essential to the effective administration of prisons."  *Hudson v. Palmer*, 468 U.S. 517, 529 (1984).  Barno fails to present evidence to contradict defendant's argument that the search was pursuant to a legitimate prison policy, Dkt. No. 33-3 ¶ 3-5 (Campagna Decl.), not "because of" Barno's comments.

To the extent that Barno argues the retaliation claim is established based on the fact that Campagna's actions took place *right after* Barno made the comments, *see* Dkt. No. 1 ¶ 23, mere timing is not enough to show retaliatory motive.  Retaliation is not established simply by showing adverse activity by defendant after protected speech; rather, Barno must show a nexus between the two.  *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this").  As explained above, Barno has failed to show such a nexus.  Absent additional evidence tying Campagna's actions to Barno's protected speech, his claim of retaliatory motive is merely speculative and does not amount to a constitutional violation.  *See id.* (summary judgment proper against plaintiff who could only speculate that adverse employment decision was due to his negative comments about his supervisor six or seven months earlier); *see also Wood*, 753 F.3d at 904.

Finally, Barno fails to present evidence sufficient to allow a jury to find the chilling effect necessary for a retaliation claim with regard to the October 8, 2018 search.  As mentioned above, searches of the inmates and their living quarters are commonplace in prisons, and random searches are routine.  Barno also fails to present evidence that would allow a reasonable juror to find that a reasonable inmate would believe, or that Barno did believe, that his cell would not be searched if he did not engage in First Amendment activity.  A reasonable jury could not find that a cell search—being so commonplace and predictably unpredictable as to when it would occur or how extensive it would be—would "chill or silence a person of ordinary firmness from future First Amendment activities."  *Rhodes*, 408 F.3d at 568.

To summarize:  Viewing the evidence in the light most favorable to Barno, no reasonable jury could find that making a comment about a prison official qualifies as protected conduct.  But even if it could so find, and again viewing the evidence in the light most favorable to Barno, no

1    reasonable jury could find that Barno's cell was searched "because of" his First Amendment

2    activities, that the search did not serve a legitimate penological purpose, or that the search had a

3    chilling effect on his First Amendment activities.  Accordingly, Campagna is entitled to summary

4    judgment on this claim.

5

6         3.    Claim 4 – Dissuading Barno From Giving Legal Assistance to Another Inmate[7]

7         Barno argues that in early 2019, Campagna took retaliatory actions against him to try "to

8    dissuade" him from helping another inmate file a grievance.  Dkt. No. 1 ¶ 20.  Although Campagna's

9    denial that he attempted to deter Barno from helping another inmate file inmate grievances would

10   entail a disputed fact, *see* Dkt. No. 33-3 ¶ 19 (Campagna Decl.), this fact is immaterial because

11   providing fellow inmates with legal assistance (*i.e.*, filing grievances) is not a protected activity

12   under the First Amendment, and thus cannot form the basis a retaliation claim.  *See Shaw v. Murphy*,

13   532 U.S. 223, 225 (2001) ("In this case, we are asked to decide whether prisoners possess a First

14   Amendment right to provide legal assistance [to fellow prisoners]...  We hold that they do not.").

15   Campagna is entitled to summary judgment on this claim.

16

17        4.    Claim 5 – Punitive Living Conditions by Kuster

18        Barno claims that March 13, 2019, Kuster retaliated against Barno for filing appeals by

19   subjecting him to "punitive living conditions," such as living in "a less desirable area where he was

20   housed with inmates with serious behavioral problems and exposed to cruel and unusual conditions

21   of confinement."  Dkt. No. 1 ¶ 22.  Meanwhile, the Court notes that the record shows that the bed

22   move on March 13, 2019 took place *after* the disposition of Barno's RVR resulting in a loss of

23   privileges.  Dkt. No. 33-7 ¶ 8, Ex. D (Saint-Louis Decl.).  Saint-Louis processed a bed move for

24   Barno from Fremont Dorm to Lassen Hall that was requested by Officer Jackson and reviewed by

25   Kuster.  *Id.*

26

27

28

---

[7] The Court will move on to its analysis of Claim 4 because, as discussed above, it has found that Barno has failed to exhaust his administrative remedies as to Claim 3.  *See supra* DISCUSSION A.2.

First, the Court finds that there is no genuine issue of material fact as to lack of retaliatory motive.  Barno alleges that Kuster's retaliatory motive was that he reviewed, and approved, the bed move because Barno had filed grievances.  *See* Dkt. No. 1 ¶ 22.  It seems the only evidence of retaliatory motive that Barno provides is that of timing—that is, he contends that he had filed grievances, and Kuster retaliated by processing the bed move.  *See id.*  Retaliatory motive may be inferred from circumstantial evidence.  *Hines v. Gomez*, 108 F.3d 265, 267-68 (9th Cir. 1997)).  It thus may be shown by the timing of the allegedly-retaliatory act and inconsistency with previous actions, as well as direct evidence.  *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).  However, nowhere in the complaint does Barno state that Kuster was aware of any of the grievances Barno had filed.  *See* Dkt. 1.  Instead, the record shows that the bed move occurred *after* the disposition of Barno's RVR resulting in a loss of privileges.  Dkt. No. 33-7 ¶ 8, Ex. D (Saint-Louis Decl.).  As stated above, inmates are expected to accept housing assignments directed by staff, and they may be moved after losing privileges due to a disciplinary action, such as in the instant action.  Dkt. Nos. 33-3 ¶¶ 6-7 (Campagna Decl.).  Barno does not present any more evidence other than his conclusory statement that Kuster's aforementioned action relating to the bed move was in retaliation for filing appeals.  *See* Dkt. No. 1 ¶ 22.  Again, the Court finds that sweeping conclusory allegations will not suffice.  *See Hansen*, 7 F.3d at 138.  Because Barno fails to offer any evidence other than his conclusory statements that the bed move was retaliatory, he has failed to carry his burden to show a genuine issue of material fact as to retaliatory motive.  Therefore, Kuster is entitled to summary judgment.

### 5.    Claim 6 – Housing With Incompatible Inmate

In Claim 6, Barno asserts Campagna retaliated against him on July 21, 2019 by "forcing him to be housed with an incompatible inmate, as threatened in the past."  Dkt. No. 1 ¶ 24.  Defendants point out that nothing in Barno's custody records or central file show that he was ever housed with an incompatible bunkmate.  Dkt. No. 33-3 ¶ 10 (Campagna Decl.).  The burden thus shifts to Barno to proffer evidence to the contrary.  The Court has carefully canvassed Barno's submissions and concludes that Barno had not proffered any evidence that would create a genuine dispute of material

United States District Court
Northern District of California

fact as to whether he was actually housed with an incompatible inmate.

In any event, although the prisoner need not show that the retaliatory action taken in response to his constitutional rights independently deprived him of a constitutional right, *see Vignolo v. Miller*, 120 F.3d 1075, 1078 (9th Cir. 1997), he must at least show that he suffered some adversity in response to his exercise of protected rights, *see Am. Civil Liberties Union of Maryland v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993). In other words, he must demonstrate that he suffered more than a *de minimis* inconvenience. *See id.* at 786 n.6; *accord Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997). Here, even if the Barno provided sufficient evidence showing he was housed with an incompatible inmate, the Court finds that he suffered no more than a *de minimis* inconvenience and that, on the facts of this case, such inconvenience does not constitute cognizable retaliation under the First Amendment. Campagna is entitled to summary judgment on this claim.

C.   Punitive Damages Claim

The dismissal of Barno's claim for punitive damages is in order, as punitive damages may be awarded in a section 1983 suit only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). There is no indication whatsoever that defendants' alleged wrongdoing rose to this requisite high level of culpability.

Accordingly, Barno's claim for punitive damages is DISMISSED.

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** the defendants' Motion For Summary Judgment in its entirety.[8] Dkt. No. 33. Barno's unexhausted claim—Claim 3—is **DISMISSED** without prejudice to refiling after exhausting California's prison administrative process. *See McKinney v. Carey*, 311 F.3d 1198, 1200-01 (9th Cir. 2002). Barno's claim for punitive damages

---

[8] The Court's finding that defendants are entitled to summary judgment as a matter of law on Barno's First Amendment claims obviates the need to address defendants' alternative argument regarding their entitlement to qualified immunity or that certain claims that were handled on the merits (*i.e.*, Claim 5 and portions of Claim 1) are unexhausted.

United States District Court
Northern District of California

is also **DISMISSED**.

The Clerk of the Court shall terminate all pending motions and close the file.

This Order terminates Docket No. 33.

**IT IS SO ORDERED**.

Dated: May 12, 2022

_____
SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

27